IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRIAN BAIRD, | ) | CASE NO. 8:05CV289 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| MEDTRONIC, INC., a Minnesota corporation, | ) ) ) ) | |
| Defendant. | ) | |

This matter is before the Court on the Plaintiff's Motion for Preliminary Injunction (Filing No. 4). Plaintiff Brian Baird and Defendant, Medtronic, Inc., both submitted briefs and indexes of evidence in support of their respective positions, and the Court heard oral argument on June 24, 2005. For the reasons stated below, the Motion for Preliminary Injunction will be denied.

## FACTS

The Plaintiff, Brian Baird ("Baird"), is a resident of Nebraska, currently employed as a sales representative of St. Jude Medical, Inc. ("St. Jude"). (Filing No. 5, Affidavit of Brian Baird ("Baird Aff.") ¶¶ 3, 8). The Defendant, Medtronic, Inc. ("Medtronic") is a manufacturer and distributor of cardiovascular medical devices, including implantable cardiac rhythm management ("CRM") devices, such as pacemakers and defibrillators. (*Id.*, ¶ 4; Filing No. 19, Declaration of Amy Rucks ("Rucks Decl.") ¶ 3). St. Jude is one of Medtronic's two major competitors in the pacemaker and defibrillator business. (Rucks Decl. ¶ 12).

From April 27, 1990 until February 26, 2005, when he began his employment with St. Jude, Baird worked as a sales representative for Medtronic. (Baird Aff. ¶ 4, 8, 13).

Baird began his work with Medtronic in California and moved to Nebraska in November 1991, with a sales territory covering most of Nebraska and part of western Iowa. (*Id.* ¶ 4, 5). When Baird was hired by Medtronic in California, he signed an employment agreement as a condition of obtaining employment. (*Id.* ¶ 13; Ex. 1 (hereafter "Employment Agreement," including "Explanation" preamble)). The Employment Agreement contains a section entitled "POST TERMINATION RESTRICTION ON EMPLOYMENT," that includes the following language:

> Recognizing that an important element of Medtronic's business success is the information, training and business relationships entrusted to its sales employees, it is agreed:
>
>> After termination of employment, Employee will not solicit sales of Competitive Products to Key Accounts located in any sales territory he/she covered or supervised for Medtronic during the last year of employment for a period of time equal to one-half the time he/she was responsible for that account (in either a sales or supervisory capacity) but not more than 270 days, provided, however, that if the Employee fails to give the notice required by paragraph 7, this restriction shall be extended for an additional period of time equal to the ninety (90) day notice period less the actual notice period.
>
> This restriction shall be of no force and effect if the employment is terminated by Medtronic without cause.

Employment Agreement ¶ 8.

The Employment Agreement defines "Medtronic Products" as "only goods or services which the Employee or those under his supervision sold or provided on behalf of Medtronic during the last year of employment." (*Id.* ¶ 2(a)). The Employment Agreement defines "Key Accounts" as "the fifteen (15) persons or entities in each sales territory which purchased the largest dollar volume of Medtronic Products during the four (4) fiscal quarters preceding termination of employment. Each Key Account expressly includes not

only the purchasing person or entity itself but all employees, agents, or representatives of that entity and any persons who control, direct or influence the purchasing decisions of that entity." (*Id.* ¶ 2(d)). The Employment Agreement also provides that its "validity, enforceability, construction and interpretation" are "governed by the laws of the State of Minnesota." (*Id.* ¶ 12). Medtronic is organized under the laws of Minnesota, has its principal place of business in Minnesota, and the Employment Agreement was executed by Medtronic in Minnesota. (Amended Complaint, Filing No. 8, ¶ 7; Employment Agreement).

On February 26, 2005, Baird resigned his employment with Medtronic without providing the 90-day notice required under the Employment Agreement, ¶ 7(b). According to Amy Rucks, Baird's former supervisor at Medtronic, on the morning of the first business day following his resignation, Baird began to solicit sales of CRM devices on behalf of St. Jude at one of his largest former Medtronic accounts. (Rucks Decl. ¶ 13). Baird contends that he has not "sold solicited, or even promoted the sales of St. Jude Medical CRM products." (Baird Aff. ¶ 10). On March 1, 2005, Medtronic sent Baird a letter reminding him of the post-termination restriction on his employment, and listing 14 accounts that Medtronic claimed were covered by that restriction (hereafter "non-compete provision"), barring Baird from selling or promoting CRM products to those entities for 360 days following his resignation. (Baird Aff. ¶ 16, Ex. 2).[1]

---

[1] At the hearing, the number of accounts Medtronic claimed to be covered by the restriction was 13. (Filing No. 29, Transcript from Hearing on the Preliminary Injunction Hearing, hereafter "Tr." 34:22 to 35:2).

3

On June 17, 2005, Baird brought this action, invoking the Court's diversity jurisdiction, and seeking declaratory and injunctive relief from the enforcement of the non-compete provision. (Complaint and Amended Complaint, Filing Nos. 1 and 8). In his Motion for Preliminary Injunction, Baird asks the Court to declare the non-compete provision invalid and unenforceable, prohibit Medtronic from interfering with his employment activities, and prohibit Medtronic from taking any action to enforce the non-compete provision other than in this Court. (Filing No. 4, Motion for Preliminary Injunction, pp. 2-3).

## ANALYSIS

This Court's analysis of Baird's Motion for Preliminary Injunction must include the weighing of four factors:

> When considering a motion for a preliminary injunction, a district court weighs **the movant's probability of success on the merits, the threat of irreparable harm to the movant absent the injunction, the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest**. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)(en banc).

*Pottgen v. Missouri State High Sch. Activities Ass'n.,* 40 F.3d 926, 929 (8th Cir. 1994) emphasis added. The burden of establishing the propriety of a preliminary injunction is on the movant. *Baker Elec. Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir 1994); *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989)(en banc)(superseded by statute on other grounds). "No single [Dataphase] factor in itself is dispositive; in each case all of the factors must be considered to determine whether on

balance they weigh towards granting the injunction." *Baker Elec. Co-op*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetic Corp., v. Lenox Lab, Inc.,* 815 F.2d 500, 503 (8th Cir. 1987), and also citing *Dataphase*. The issuance of a preliminary injunction will be reversed only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise." *City of Timber Lake v. Cheyenne River Sioux Tribe,* 10 F.3d 554, 556 (8th Cir. 1993) *cert. denied* 512 U.S. 1236 (1994).

Of the three requests Baird presents to the Court in his motion for preliminary injunction, only one is appropriately addressed in the context of such a motion. His first request, that I declare the non-compete provision invalid and unenforceable, is really a request that I dispose of the case on the merits within days after the filing of the action, and when Medtronic has had little or no opportunity to defend its position. His third request, that I prohibit Medtronic from filing any action in any other court to enforce the non-compete provision, asks me to predict actions that Medtronic has not taken and expressly has no intention of taking,[2] and preempt those theoretical actions. I decline to use the preliminary injunction procedure to attempt to strip other courts of jurisdiction in actions that may or may not be filed in the future. If Medtronic were to file a parallel proceeding in another jurisdiction, Baird could renew his motion to enjoin the second-filed lawsuit, and the matter then could be reviewed applying the standards set forth in *Northwest Airlines,*

---

[2] At the hearing on June 24, 2005, counsel for Baird expressed concern that Medtronic might file a Minnesota state-court action to enforce the non-compete provision, and join St. Jude as a party defendant, preventing the removal of the action to federal court and the consolidation of actions due to St. Jude's nondiverse status vis a vis Medtronic. (Tr. 26:19 to 25). Counsel for Medtronic stated: "Medtronic has no intention to file another action in another court, your Honor." (Tr. 30:4-5). "Your Honor, I will represent to you as an officer of the Court that we will not start another action in any other jurisdiction. . . . I do represent to you, your Honor, as an officer of the court that we will not start another action." (Tr. 55:14 to 56:2).

*Inc., v. American Airlines, Inc.*, 989 F.2d 1002, 1004-05 (8th Cir. 1993), and *United States Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 488-89 (8th Cir. 1990).[3]

Baird's remaining request is for a preliminary injunction prohibiting Medtronic from interfering with his employment activities. That request will be considered, applying the *Dataphase* factors.

### Baird's Probability of Success on the Merits

Because this action is brought pursuant to the Court's diversity jurisdiction, and because Nebraska is the forum state, Nebraska's choice-of-law rules govern. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941); *Mertz v. Pharmacists Mut. Ins. Co.*, 625 N.W.2d 197, 202 (Neb. 2001). Nebraska courts look to the Restatement (Second) of Conflict of Laws §§ 6 and 196 (1971), when determining the enforceability of a non-compete provision in an employment agreement. *Mertz*, 625 N.W.2d at 201. The Restatement (Second) of Conflict of Laws provides:

> The validity of a contract for the rendition of services and the rights created thereby are determined, **in the absence of an effective choice of law by the parties,** by the local law of the state where the contract required that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

*Id.* § 196, emphasis added.

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

---

[3]"The well-established rule is that in cases of concurrent jurisdiction, 'the first court in which jurisdiction attaches has priority to consider the case.' . . . This first-filed rule "is not intended to be rigid, mechanical, or inflexible,' . . . but is to be applied in a manner best serving the interests of justice. The prevailing standard is that 'in the absence of compelling circumstances,' . . . the first-filed rule should apply.*" Northwest Airlines, Inc.*, 989 F.2d at 1005, internal citations omitted.

6

>   (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>   (a the needs of the interstate and international systems,
>   (b the relevant policies of the forum,
>   ©) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>   (d) the protection of justified expectations,
>   (e) the basic policies underlying the particular field of law,
>   (f) certainty, predictability and uniformity of result, and
>   (g) ease in the determination and application of the law to be applied.

*Id.* § 6.

The Employment Agreement itself states that its "validity, enforceability, construction and interpretation" . . . "shall be governed by the laws of the State of Minnesota." (Employment Agreement ¶ 12). Although Baird contends that the Employment Agreement was void *ab initio* because he signed it in California and it allegedly was void under California law, he argues for the application of Nebraska law rather than Minnesota law in the event that the Court declines to declare the Employment Agreement void *ab initio*. (Plaintiff's brief, Filing No. 6, pp. 11-18). Medtronic concedes the application of Nebraska law for purposes of the pending motion only. (Defendant's brief, Filing No. 18, p. 16).

I am not persuaded that Baird has a likelihood of success on his argument that the Employment Agreement was void *ab initio*. Baird cites the California Business and Professions Code § 16600 for the proposition that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." (Plaintiff's Brief, p. 12). Medtronic notes that California does not automatically void non-compete provisions designed to protect trade secrets or governed by a choice-of-law clause opting for the law of another jurisdiction. *Loral Corp. v. Moyes*, 174 Cal. App. 3d 268, 276, 219 Cal. Rptr. 836, 841 (1985); *Advanced Bionics Corp. v. Medtronic.*, Inc., 29 Cal. 4th 697, 706, 59 P.3d 231 (Cal. 2002). The Employment Agreement at issue was executed by Medtronic in Minnesota, the location of its corporate

7

headquarters, and contains the Minnesota choice-of-law provision. Medtronic also argues, persuasively, that Baird operated under the Employment Agreement for nearly 15 years, more than 13 of which were in the state of Nebraska. (Defendant's Brief, p. 16). Application of California law would not protect the justified expectations of the parties. There is also no doubt that Nebraska and Minnesota are the states with the greatest interest in the determination of the issue of the validity of the non-compete provision, and that they are the states with the most significant relationship to the transaction and the parties.

I will apply Nebraska law for purposes of the *Dataphase* analysis. To determine whether a covenant not to compete is valid, Nebraska courts consider whether the restriction is (1) reasonable in the sense that it is not injurious to the public, (2) not greater than is reasonably necessary to protect the employer in some legitimate interest, and (3) not unduly harsh and oppressive on the employee. *Mertz*, 625 N.W.2d at 204, citing *Professional Bus. Servs. V. Rosno*, 589 N.W.2d 826 (Neb. 1999); *Moore v. Eggers Consulting Co.*, 562 N.W.2d 534 (Neb. 1997). Because I will address the matters of irreparable harm, balance of harms, and public interest below, I will focus here on the question of whether the non-compete provision is greater than reasonably necessary to protect Medtronic's legitimate interests.

Baird concedes that the non-compete provision is not too broad or restrictive in its duration. (Tr. 15:2-9). He argues that the provision is too broad in its scope, because it prohibits him from soliciting sales of competitive products to "Key Accounts" in the sales territory in which he worked during his last year of employment with Medtronic. (Tr. 8:7 to 9:18). At the hearing, it became apparent that Baird's interpretation of the non-compete provision was actually more restrictive that Medtronic's own interpretation. I find

8

Medtronic's interpretation to be consistent with the language of the Employment Agreement. Baird had inferred that he was barred from contacting the 15 persons or entities in his former sales territory that purchased the largest volume of products from Medtronic during his last year of employment, whether or not he had any dealings with those entities himself during that time. (Tr. 9:12-18). In fact, the non-compete provision restricts him from contacting the 15 persons or entities that purchased the largest volume of goods or services that Baird or those under his supervision sold or provided on behalf of Medtronic during his last year of employment.[4] (Tr. 37:7-19; 48:5-10; Employment Agreement ¶¶ 2(a), 2(d), 7).

Nebraska courts have recognized that an employer has a legitimate interest in protection against a former employee's competition with respect to customers with whom the former employee had substantial personal contact. *Mertz.*, 625 N.W.2d at 204, citing *Rosno*, 589 N.W.2d at 831; *Moore,* 562 N.W.2d at 534; *Whitten v. Malcolm*, 541 N.W.2d 45 (Neb. 1995); *and Vlasin v. Len Johnson & Co.*, 455 N.W.2d 772 (Neb. 1990). Although Baird also argues that the non-compete provision is too broad because it restricts him from contacting "not only the purchasing person or entity itself but all employees, agents, or representatives of that entity and any persons who control, direct or influence the purchasing decisions of that entity" (Employment Agreement ¶ 2(d)), I cannot conclude that Baird has demonstrated a likelihood of success on the merits, warranting the entry of a preliminary injunction.

***The Threat of Irreparable Harm to Baird***

---

[4] I recognize that whether Baird actually sold goods or services, or supervised those who did sell goods or services, to the 13 Key Accounts that Medtronic now contends are governed by the non-compete provision is a factual issue remaining to decided.

9

In his brief and affidavit, Baird alleges that he "will suffer severe and irreparable hardship if he is unable to work and earn a living in his chosen profession and actively uphold his business reputation in that profession for the next year."[5]  Despite such conclusory allegations, and despite repeated inquiries by the Court at the hearing, Baird presented no evidence of irreparable harm.  (Tr. 10:2 to18:6).  Baird has been employed by St. Jude since February 26, 2005, at an undisclosed salary and commission.  (Baird Aff. ¶ 8; 17:24 to 18:6).  St. Jude manufactures products other than CRM devices, and Baird is free to sell those products to anyone, including his former Medtronic accounts.  (12:11-20).  Baird is also free to sell St. Jude's CRM devices to entities other than the accounts covered by the non-compete provision, and there are several such entities in Nebraska, Iowa, and neighboring states.  (Rucks Decl. ¶¶ 7, 15).  Assuming that Baird will suffer some financial loss by not earning commissions on CRM devices that he might otherwise sell to the prohibited accounts during the next eight months, such a loss is not necessarily irreparable, because it can be compensated for by monetary damages.  *See, e.g., Minnesota Ass'n of Nurse Anesthetists v. Unity Hospital,* 59 F.3d 80, 83 (8th Cir. 1995), citing *O'Connor v. Peru State College*, 728 F.2d 1001, 1003 (8th Cir. 1984).

***Balance of the Harms***

No doubt Baird will suffer some financial harm if he is not at liberty to sell CRM devices to the prohibited accounts during the next eight months, and the personal rapport he has developed with individuals who make the purchasing decisions for those entities may deteriorate.  Medtronic has quantified its risk of harm in more concrete terms.  In the calendar year before he resigned from Medtronic, Baird generated sales of more than

---

[5]Plaintiff's brief, Filing No. 6, p. 9.  *See also* Baird Aff. paragraphs 29-32.  The actual time remaining on the non-compete clause at the time of the hearing was eight months.

$12.1 million in CRM devices. (Rucks Decl. ¶ 11). Both Baird and Medtronic acknowledge that physicians and other medical personnel at hospitals place heavy reliance on sales representatives when making CRM purchasing decisions. (Rucks Decl. ¶ 9; Baird Aff. ¶¶ 6-7; 35:24 to 36:9). Although Baird argues that enforcement of the remaining eight-month non-compete term will give Medtronic "an unfair competitive advantage" (Baird Aff. ¶ 25), Medtronic argues at least as persuasively that a failure to enforce the remaining term of the non-compete provision will give *Baird* an unfair competitive advantage. (Rucks Aff. ¶¶ 4 - 11).

The reasons underlying the non-compete provision were disclosed in the Employment Agreement: "The idea behind the restriction is simply to give Medtronic time to hire and train a new sales representative, enable the new sales representative to learn about the accounts and establish relationships sufficient to enable him/her to compete with the former representative on relatively equal footing." (Employment Agreement, Explanation preamble, p.1). Whether or not the non-compete provision in the Employment Agreement is ultimately determined to be fairly tailored to achieve that objective, I conclude that the balance of harms weighs in Medtronic's favor at this stage.[6] In reaching this conclusion, I have also considered Medtronic's arguments to the effect that it relied on the non-compete provision when providing Baird with training, confidential account information, and substantial financial compensation over the term of his 15-year employment, and he accepted those benefits with the knowledge that Medtronic expected him to abide by the non-compete provision. (Rucks Decl. ¶¶4 - 11)

---

[6] Baird's counsel argued that if the agreement is determined to be overly broad, then as a matter of Nebraska law, the employee is more likely to be harmed than the employer. (Tr.52: 17-19). Because I have determined that Baird has not shown a likelihood of success on the merits, this argument addressing balance of harms is not persuasive.

*The Public Interest*

The public interest should not be affected by a ruling on the pending motion. The public and the "prohibited entities" will continue to have access to CRM devices, whether those devices are manufactured by Medtronic, St. Jude, or another company, and whether they are sold by Baird or someone else. Medtronic argues that "the public interest is better served by making its citizens meet their promises than by allowing employees to breach them after reaping their benefits." (Tr. 46:11-13). While that point is well-taken, I find that this *Dataphase* factor does not weigh in favor of either party.

IT IS ORDERED:

1. Plaintiff Brian Baird's Motion for Preliminary Injunction (Filing No. 4) is denied.

Dated this 30th day of June, 2005.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge